1  DeConcini McDonald Yetwin & Lacy, P.C.
   2525 East Broadway Blvd., Suite 200
2  Tucson, AZ 85716-5300
   (520) 322-5000
3

4  Gary F. Urman (AZ # 11748)
   gurman@dmyl.com
5  Attorneys for Plaintiff

6            IN THE UNITED STATES DISTRICT COURT

7             IN AND FOR THE STATE OF ARIZONA

8
   Jeff Kendig, Individually and on          NO.
9  Behalf of All Others Similarly
   Situated,                                 **CLASS ACTION COMPLAINT FOR**
10                                           **VIOLATIONS OF SECTONS 13(e),**
                        Plaintiff,           **14(a) AND 20(a) OF THE**
11                                           **SECURITIES EXCHANGE ACT OF**
   vs.                                       **1935 AND RULES 13e-3 AND 14a-9**
12
   Northern Tier Energy LP, Northern
13 Tier Energy GP LLC, David L.
   Lamp, Paul L. Foster, Lowry
14 Barfield, Timothy Bennett, Rocky L.
   Duckworth, Thomas Hofmann, Dan
15 F. Smith, Jeff A. Stevens, Scott D.
   Weaver, Western Refining, Inc.,           **JURY TRIAL DEMAND**
16 Western Acquisition Co., LLC and
   Evercore Group L.L.C.
17
18                      Defendants.

19
20            **CLASS ACTION COMPLAINT**

21        Jeff Kendig ("Plaintiff"), on behalf of himself and all others similarly situated,

22 by and through his attorneys, alleges the following upon information and belief,

23 including investigation of counsel and review of publicly-available information,

24 except as to those allegations pertaining to Plaintiff, which are alleged upon personal

25 knowledge:

26

1.      This is a class action brought by Plaintiff on behalf of himself and the other former common unitholders of Northern Tier Energy LP ("NTI" or the "Partnership"), other than Defendants (defined below) and their affiliates (the "NTI Unaffiliated Unitholders"), against NTI, Northern Tier Energy GP LLC ("NTI GP"), the general partner of NTI, the members of the board of directors of NTI GP (the "Board" or the "Individual Defendants"), Western Refining, Inc. ("WNR"), Western Acquisition Co, LLC ("MergerCo"), and Evercore Group L.L.C. ("Evercore") for their violations of Sections 13(e), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78m(e), 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and SEC Rule 13e-3, 17 C.F.R. 240.13e-3, in connection with the going private transaction between NTI and WNR, whereby WNR acquired the 61.6% of outstanding NTI common units it did not already own in exchange for inadequate consideration.  The Transaction closed on June 23, 2016.

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading proxy statement/prospectus (the "Proxy"), pursuant to Sections 13(e) and 14(a) of the Exchange Act and Rules 14a-9 and 13e-3, to be filed with the SEC.  The Proxy recommended that NTI Unaffiliated Unitholders vote in favor of the merger between NTI and WNR (the "Transaction" or "Merger") whereby WNR acquired the 61.6% of NTI's outstanding common units it did not own prior to the Merger in exchange for inadequate consideration, valued at approximately $26.06 per share based on WNR's closing stock price as of December 18, 2015, the last trading day prior to the

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd. Suite 200
Tucson, AZ 85716-5300

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

announcement of the Transaction, and ultimately valued at a mere $21.05 per share when the Transaction closed.[1]

3.     NTI Unaffiliated Unitholders had the choice to elect to receive consideration, subject to proration, of either: (i) $15.00 in cash without interest and 0.2986 of a share of WNR Common Stock (the "Mixed Election" or "Standard Mix of Consideration"), or (ii) $26.06 in cash without interest (the "Cash Election"), or (iii) 0.7036 of a share of WNR Common Stock (the "Stock Election" and collectively, the "Merger Consideration").    The Cash Election and the Stock Election were subject to proration to ensure that the total amount of cash paid and the total number of shares of WNR Common Stock issued in the Merger to NTI Public Unitholders as a whole were equal to the total amount of cash and number of shares of WNR Common Stock that would have been paid and delivered if all NTI Public Unitholders received the Standard Mix of Consideration.

4.     As discussed below, the Merger Consideration NTI Unaffiliated Unitholders received in connection with the Transaction and the process by which Defendants consummated the Transaction were fundamentally unfair to Plaintiff and the NTI Unaffiliated Unitholders.  Defendants asked NTI Unaffiliated Unitholders to support the Transaction in exchange for the inadequate Merger Consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 13(e), 14(a) and 20(a) of the Exchange Act and Rules 14a-9 and 13e-3.  Specifically, the Proxy contained

---

[1]     Based upon WNR's $20.25 closing price on the day the Merger closed, June 23, 2016.

materially incomplete and misleading information concerning: (i) the valuation of the Merger Consideration and financial analyses conducted by Evercore, financial advisor to the NTI GP Conflicts Committee; (ii) the projected financial information furnished to the NTI GP Conflicts Committee and Evercore for purposes of evaluating the Transaction; and (iii) Defendants' views with respect to the fairness of the Merger and Merger Consideration to NTI Unaffiliated Unitholders in light of the various indications that the Merger Consideration was not in fact fair to them.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 13(e), 14(a) and 20(a) of the Exchange Act and SEC Rules 14a-9 and 13e-3.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) NTI maintains its primary

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

9.    Plaintiff was, and had been at all relevant times, the owner of NTI common units until the consummation of the Merger, at which time he received the inadequate Merger Consideration in exchange for his units.  Plaintiff held his NTI units since prior to the wrongs complained of herein.  Plaintiff is a resident of Nashville, Tennessee.

10.    Defendant NTI is a Delaware limited partnership that maintains its principle executive offices in Tempe, Arizona.  NTI is a downstream energy limited partnership with refining, retail and logistics operations that served the Midwest region of the United States.

11.    Defendant NTI GP is a Delaware limited liability company, the general partner of NTI and a wholly-owned subsidiary of WNR.

12.    NTI and NTI GP are collectively referred to as the "NTI Defendants".

13.    Individual Defendant David L. Lamp ("Lamp") served as President and CEO of NTI GP between March 2014 and the close of the Merger.  He also served as a director of NTI GP between April 2014 and the close of the Merger. Previously, Lamp served as the Senior Vice President and Chief Operating Officer for HollyFrontier Corporation, an independent petroleum refiner, since 2011, and in

a variety of senior management positions with Holly Corporation, an independent petroleum refiner, including President, since 2004. Lamp also serves as Chairman of the American Fuel & Petrochemical Manufacturers Association, the industry trade association for the refining and petrochemical industry. Lamp is a citizen of Texas.

14. Individual Defendant Paul L. Foster ("Foster") served as a director of NTI GP between November 2013 and the close of the Merger and Chairman of the Board between January 2014 and the close of the Merger. Foster also currently serves as the executive chairman of WNR, and has served as WNR's chairman of the board since September 2005. Previously, Foster served as WNR's chief executive officer from September 2005 until January 2010, when he was appointed its executive chairman. In addition, Foster served as WNR's president from September 2005 to February 2009, and as president of one of its affiliates since 1997. Foster also serves as chairman of the board of the general partner of Western Refining Logistics, LP, a publicly traded master limited partnership that owns and operates logistics, storage, transportation and wholesale assets; as chairman of the University of Texas System Board of Regents; as a director of WestStar Bank, an El Paso-based bank; as a chairman of the board of Vomaris Innovations, Inc., a privately held medical device company; as a member of the board of managers of Jordan Foster Construction, LLC, a Texas based privately owned construction firm; and as a director of the Federal Reserve Bank of Dallas - El Paso Branch. Foster is a citizen of Texas.

15.   Individual Defendant Lowry Barfield ("Barfield") served as a director of NTI GP between November 2013 and the close of the Merger.  Barfield is currently the senior vice president - legal, general counsel and secretary of WNR, and as the general partner of Western Refining Logistics, LP.  Previously, he served as vice president - legal, general counsel and secretary of WNR from 2005 to 2007. Barfield has represented WNR and its affiliates in various legal capacities since 1999, as well as other large manufacturing and business clients since 1984, both at his own law firm and as a partner in several national firms.  Barfield is a citizen of Arizona.

16.   Individual Defendant Timothy Bennett ("Bennett") served as a director of NTI GP between January 2014 and the close of the Merger.  Bennett served as a member of the NTI GP Conflicts Committee.  Bennett served as executive vice president of CIT Group, Inc. a financial services company, from March 1999 to June 30, 2009.  Bennett worked at several commercial finance companies from 1980 through 1985.  In 1986, he joined CIT Group.  Bennett is a citizen of New York.

17.   Individual Defendant Rocky Duckworth ("Duckworth") served as a director of NTI GP between May 2013 and the close of the Merger.  Duckworth acted as Chairman of the NTI GP Conflicts Committee.  Since October 2010, Duckworth has been retired and a private investor.  Duckworth is a former partner of KPMG LLP.  Duckworth became a KPMG partner in 1981, partner in-charge of the audit practice in Oklahoma City in 1984, and he was the Managing Partner of the Oklahoma City office from 1987 to 2000 when he relocated to the Houston office to serve global energy clients and as the energy industry leader of the audit practice.

DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

Duckworth served as the lead audit engagement partner on large, multi-national clients operating in different segments of the energy industry including upstream oil and gas exploration and production companies, energy marketing and trading companies, and merchant independent power producers and retail power providers. Duckworth is also a member of the board of directors and chairman of the audit committee of Magnum Hunter Resources Corporation (NYSE: MHR), a Houston-based oil, natural gas and natural gas liquids exploration and production company; and a member of the board of directors, chairman of the audit committee and a member of the compensation and nominating and governance committees of Glori Energy, Inc. (NYSE: GLRI), a company focused on increasing production and recovery from mature oil wells.  Duckworth is a citizen of Texas.

18.    Individual Defendant Thomas Hofmann ("Hofmann") served as a director of NTI GP between June 2012 and the close of the Merger and of Northern Tier Energy LLC between May 2011 and the close of the Merger.  Hofmann served as a member of the NTI GP Conflicts Committee.  Hofmann served as senior vice president and chief financial officer of Sunoco, Inc., an oil refining and marketing company, from January 2002 until his retirement in December 2008.  Hofmann also serves as a director of West Pharmaceuticals Services, Inc., a pharmaceutical and medical device company, and of CPP GP LLC, the general partner of Columbia Pipeline Partners LP, a master limited partnership which owns and operates natural gas pipelines and integrated underground storage systems, and served as a director of the general partner of PVR Partners, L.P., a natural gas gathering and processing

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

company and coal and natural resources property management company, until 2014. Hoffman is a citizen of Pennsylvania.

19.     Individual Defendant Dan F. Smith ("Smith") served as a director of NTI GP between June 2012 and the close of the Merger and of Northern Tier Energy LLC between May 2011 and the close of the Merger.  Smith served as a member of the NTI GP Conflicts Committee.  Smith served as Executive Chairman of the board of directors of NTI GP and Northern Tier Energy LLC from December 20, 2012 through January 2, 2014 and previously served as Chairman of the board of directors of NTI GP from June to December 2012 and of Northern Tier Energy LLC from November 2011 to December 2012.  Smith is the former chairman, president and chief executive officer of Lyondell Chemical Company, a plastics, chemicals and refining company.  He began his career with ARCO (Atlantic Richfield Company) in 1968 as an engineer.  He was elected president of Lyondell Chemical Company in August 1994, chief executive officer in December 1996 and chairman of the board of directors in May 2007.  Smith also served as chief executive officer of Equistar Chemicals, LP, a producer of ethylene, propylene, polyethylene and other products, from December 1997 through December 2007 and as chief executive officer of Millennium Chemicals Inc., a manufacturer and marketer of chemicals, from November 2004 until December 2007.  Smith has been a chairman and a director of Kraton Performance Polymers, Inc., a global producer of engineered polymers, since 2008, chairman and a director of Axip Energy Services, LP (successor to Valerus Compression Services, L.P.), a compression production and facility services provider, since 2010; chairman

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

and a director of Nexeo Solutions Holdings, LLC, a global distributor of chemical products, since 2011; and Orion Engineered Carbons S.A., a producer of carbon black, since 2014.  Smith also serves as a member of the College of Engineering Advisory Council at Lamar University.  Smith also served as a director of Cooper Industries PLC, an electrical products manufacturer, for 12 years, until its sale to Eton Corp. PLC, an industrial manufacturer, in 2012.  Smith is a citizen of Texas.

20.     Individual Defendant Jeff A. Stevens ("Stevens") served as a director of NTI GP between November 2013 and the close of the Merger.  Stevens is currently the President and Chief Executive Officer of WNR, and of the general partner of Western Refining Logistics, LP.  Stevens has served on the boards of directors of Western Refining since September 2005 and of Western Refining Logistics' general partner since October 2013.  Previously, Stevens served as WNR president since February 2009, its chief operating officer since April 2008, its executive vice president since September 2005 and as executive vice president of one of its affiliates since 2000.  Stevens also serves on the board of directors of Vomaris Innovations, Inc., a privately held medical device company.  Stevens is a citizen of Arizona.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to as the "Individual Defendants" or the "Board".

22.     WNR is a Delaware corporation that maintains its principal executive offices in El Paso, Texas.  WNR is an independent refining and marketing company. The refining segment operates refineries in El Paso, and Gallup, New Mexico. The retail segment includes retail service stations, convenience stores, and unmanned

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

fleet fueling locations in Arizona, Colorado, New Mexico, and Texas. Prior to the Merger, WNR owned the general partner and approximately 66% of the limited partnership interest in Western Refining Logistics, LP (NYSE:WNRL) and the general partner and approximately 38% of the limited partnership interest in NTI.

23.    MergerCo is a Delaware limited liability company and wholly-owned subsidiary of WNR, and was created for purposes of effectuating the Transaction.

24.    WNR and MergerCo are collectively referred to as the "WNR Defendants".

25.    Evercore Group L.L.C. is a Delaware limited liability company that operates as an investment banking advisory firm. Evercore offers mergers and acquisitions, divestitures and restructurings, financings, public offerings, private placements, research, trading execution, and investment management services. Evercore serves clients worldwide and maintains offices throughout the United States.

26.    The Defendants referred to in paragraphs 10-25 are collectively referred to herein as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

### A.    The Transaction Undervalued NTI

27.    NTI was an independent downstream energy limited partnership with refining, retail and logistics operations that served the PADD II region of the United States.[2] The Partnership operated assets in two business segments: the refining

---

[2]    The PADD II region covered Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, Ohio, Oklahoma, Tennessee and Wisconsin.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

business and the retail business.  The refining segment primarily consisted of a 97,800 barrels per stream day ("bpsd") refinery located in St. Paul Park, Minnesota. The refinery's complexity allowed NTI to process a variety of light, heavy, sweet and sour crudes into higher value refined products.  NTI was one of only two refineries in Minnesota and one of four refineries in the Upper Great Plains area within the PADD II region.  NTI's strategic location gave it direct access, primarily via the Minnesota Pipeline, to abundant supplies of advantageously priced crude oils.  Absent the Merger, NTI expected to continue to benefit from its access to growing crude oil supplies.  NTI's location also allowed it to distribute its refined products throughout the Midwestern United States.  NTI's retail segment operated approximately 165 convenience stores under the SuperAmerica brand and also supported approximately 89 franchised convenience stores, which were also operated under the SuperAmerica brand.  These convenience stores were located primarily in Minnesota and Wisconsin and sold various grades of gasoline and diesel, tobacco products and immediately consumable items such as beverages, prepared food and a large variety of snacks and prepackaged items.

28.    The Merger Consideration failed to adequately compensate NTI Unaffiliate Unitholders in light of the Partnership's recent strategic achievements and strong growth prospects.

29.    Indeed, several articles published by investor news service *Seeking Alpha* lambasted the Transaction for not providing adequate consideration to NTI Unaffiliated Unitholders.

30.     With respect to whether the premium offered to NTI Unaffiliated Unitholders was high enough, one article stated:

> **WNR is stealing NTI at the current price of under $27 per unit.**  Sure, investors would get an upfront premium. NTI's unit price was already trading above $27 per unit as early as August, when the Whiting refinery outage boosted crack spreads across the country.  In addition, NTI's share price is down in recent weeks largely due to the impact of the unplanned maintenance and the refinery outage.   I believe the stock price would have organically recovered to near or above the current offer price for WNR just via its fundamentals…NTI is worth more than WNR is offering.[3]

31.     Another article entitled **"Updated Western Refining Offer Terms Continue To Undervalue Northern Tier's Shares"** stated:

> The final offer has changed somewhat from Western's initial offer in October, but the net result is the same for Northern Tier shareholders; **they aren't getting full value**…While Northern Tier shareholders are disappointed, the transaction will be hugely accretive for Western…my plan as a current Northern Tier shareholders is to vote against the deal, and hope that enough other shareholders do the same and force Western to bump its offer up to around $30/share.[4]

32.     Another article stated:

---

[3]     Albert Alfonso, *Northern Tier Energy: What To Make Of The Western Refining Takeover*, Seeking Alpha (Oct. 28, 2015, 6:00 AM), http://seekingalpha.com/article/3612256-northern-tier-energy-make-western-refining-takeover.

[4]     Aurelien Windenberger, *Updated Western Refining Offer Terms Continue To Undervalue Northern Tier's Shares*, Seeking Alpha (Dec. 22, 2015, 5:01 PM), http://seekingalpha.com/article/3772456-updated-western-refining-offer-terms-continue-undervalue-northern-tiers-shares.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

[T]he deal still undervalues NTI…**Given the unique value of NTI's assets, I think the deal, in any form, undervalues one of the best remaining single assets in the refining space**.[5]

33. Another article stated:

"[T]his deal undervalues Northern Tier…**WNR is underpaying for NTI by quite a bit**. The current deal values NTI at $26 per unit. Though, given NTI's cash generation potential, this does not seem to be enough. Over the past four quarters, NTI has distributed $3.80 per unit to its unitholders. As a variable rate MLP, NTI distributes nearly all of its incoming cash each quarter. This means that WNR is offering up less than 7.4x distributable cash flow. Typically, MLPs trade between 1012x cash flow multiple, which would have NTI at $38 to $45 per unit. Though, with NTI being a refiner, which has less stable earnings power versus pipelines, a discount is warranted. Though, even applying an 8x multiple, NTI would still merit over $30 per unit. **Even when using traditional metrics, NTI is being acquired at a cheap price.** WNR's offer values NTI at just over 6x TTM EV/EBITDA. This is for a company that grew EBITDA by 40% from the prior year and has many organic growth opportunities. With WNR now more [or] less locked into buying NTI, I do not feel there is much point in fighting the merger. They already own 38% of the common units, so this seems like a slam dunk for them. Yes, in my opinion, WNR is undervaluing NTI.[6]

---

[5]    *Northern Tier Energy And Western Refining Sign Definitive Merger Agreement: My Initial Read On Unitholders' Options*, Seeking Alpha (Dec. 23, 2015 7:29 AM), http://seekingalpha.com/article/3773256-northern-tier-energy-western-refining-sign-definitive-merger-agreement-initial-read.

[6]    Albert Alfonso, *What To Make Of The Northern Tier Energy And Western Refining Merger Agreement*, Seeking Alpha (Dec. 24, 2015, 2:28 AM),

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

34.     Another article stated:

I think Northern Tier should reject the takeover, as shares are worth well over $30 in my view…Northern Tier is undervalued…At a current share price of $25.81, Northern Tier trades at a P/E of just 6.60 and a forward P/E of 7.31 based on the average EPS estimate of $3.54 by the 10 analysts covering the company, according to Yahoo Finance, although this estimate seems low given Northern Tier's recent results. With $4.40 in 2016 EPS (Q3 results annualized), Northern Tier trades at a forward P/E of just 5.87.  There's also the dividend: Northern Tier chooses to pay out most of its profits to shareholders via dividends. The board of directors has declared a quarterly dividend of $1.04 per unit for Q3, and is on pace for $4.16 per unit in dividends for 2015, which is covered from the $4.80 in net earnings per unit expected in 2016; with shares trading at $25.90, the stock currently yields 16.15%. Total debt and financing obligations remain a very reasonable amount at $360.4 million.   Meanwhile, as mentioned, Western Refining (NYSE:WNR) proposed a takeover of Northern Tier, offering $17.50 in cash and .2266 of a share of Western common stock for each Northern Tier share. This isn't too surprising, since Western already owns a 38% stake in Northern Tier.  **It's a very low offer in my opinion: with over $4 in EPS annually, Northern Tier is worth well over $30 per share in my opinion. The buyout was simply not offered at a high enough premium.** Meanwhile, NTI shareholders would go from owning a 14% yielding stock to one that yields just 3.6%. I remain long shares of Northern Tier in spite of this lowball takeover offer, as I don't think the deal will be accepted.[7]

---

http://seekingalpha.com/article/3775076-make-northern-tier-energy-western-refining-merger-agreement.

[7]     *Why I Bought Shares Of Northern Tier Energy*, SEEKING ALPHA (Dec. 10, 2015  2:11  PM),  http://seekingalpha.com/article/3747986-bought-shares-northern-tier-energy.

35.    The disdain many NTI Unaffiliated Unitholders and industry followers had for the Transaction is supported by analysts' pre-Merger price targets for the Partnership.  Indeed, several analysts issued price targets for NTI above the Merger Consideration in the months leading up to the announcement of the Transaction, including: Barclays, which issued a price target of $31 on January 27, 2016; RBC Capital Markets, which issued a price target of $30 on October 26, 2015, and; Credit Suisse, which issued a price target of $34 on October 7, 2015.

36.    The Merger Consideration was also inadequate in light of the Partnership's strong financial results in recent quarters prior to the close of the Transaction.

37.    On August 4, 2015, NTI announced the following impressive second quarter results: second quarter 2015 Net Income was $128.9 million, compared to $57.9 million for second quarter 2014; Adjusted Net Income was $90.7 million for second quarter 2015, compared to $61.4 million for the prior year quarter; and Adjusted EBITDA for second quarter 2015 was $116.7 million, compared to $82.1 million for second quarter 2014, primarily due to higher gross margins per barrel, along with higher throughput.

38.    Commenting on the strong second quarter results, Individual Defendant Lamp stated:

> In the second quarter of 2015 our St. Paul Park refinery achieved **record-setting** quarterly throughput of approximately 99,000 barrels per day. **Product margins were strong, led by robust gasoline crack spreads.** In retail, we saw an increase in fuel volumes, fuel margins and merchandise sales. With these solid results, I am pleased to announce a second quarter distribution of $1.19 per

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

unit…We made good progress with our organic growth initiatives during the quarter, including equipment procurement and continued construction on the crude unit desalter and #2 crude unit revamp projects. In retail, our general partner's Board of Directors recently approved the building of two additional stores, for a total of five approved in 2015, one of which is currently under construction. We added four franchise locations during the second quarter, for a total of ten new franchise locations this year.

39. Most recently before announcing of the Transaction, on November 3, 2015, NTI announced the following impressive third quarter results: third quarter 2015 Net Income was $103.5 million, compared to $96.2 million for third quarter 2014; adjusted Net Income was $140.3 million for third quarter 2015, compared to $96.2 million for the prior year quarter; and Adjusted EBITDA for third quarter 2015 was $173.3 million compared to $122.8 million for third quarter 2014, due to higher gross margins per barrel.

40. Commenting on the strong third quarter results, Individual Defendant Lamp stated:

> **This was an outstanding quarter for Northern Tier.** We experienced an unplanned shutdown of our No. 2 Crude Unit at the end of September for crude tower repairs but were able to minimize the impact of the downtime by drawing down our finished product inventories. Our retail segment also performed well with our network of company-operated and franchise store locations achieving record fuel sale volumes. With these results, I am pleased to announce a third quarter distribution of $1.04 per unit…Our general partner's Board of Directors recently approved the purchase and relocation to the St. Paul Park refinery of an existing 5,000 barrel per day Solvent Deasphalting unit, or SDA, for a total installed cost of

DE CONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

approximately $63 million. The SDA is expected to be completed in mid-2017 and thereafter should contribute approximately $27 million annually in EBITDA, driven by upgrading residual oils for conversion to gasoline and diesel using our excess FCC capacity. Meanwhile, we continue to make good progress on the organic growth projects we previously announced, including our crude unit desalter and No. 2 crude unit revamp projects as well as the construction of new company-operated retail stores.

41.     Furthermore, the Merger Consideration failed to adequately compensate NTI Unaffiliated Unitholders in light of the strong annual dividend payments they have received from NTI over the past three years, as compared to the premium provided by the Merger Consideration:

| NTI Quarterly Distribution | Feb. | May | Aug. | Nov. | Total Yield | Yield Percentage |
|---|---|---|---|---|---|---|
| 2013 | 1.27 | 1.23 | .68 | .31 | 3.49 | 14.0% |
| 2014 | .41 | .77 | .53 | 1.00 | 2.71 | 10.8% |
| 2015 | .49 | 1.08 | 1.19 | 1.04 | 3.80 | 15.2% |

42.     Following the close of the Transaction, the aggregate amount of cash dividends that NTI Unaffiliated Unitholders who continue to hold shares of WNR common stock will receive is expected to be lower than the amount of cash distributions they would have received had the Merger not occurred.

43.     In sum, the Merger Consideration failed to fairly compensate NTI Unaffiliated Unitholders in light of the Partnership's recent strategic achievements, strong financial results, and prospects for future growth.  Nevertheless, the Board agreed to sell the Partnership at a price below its intrinsic value to its largest unitholder, WNR, after conducting a fundamentally flawed strategic review and

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

negotiation process.   As a result of the materially incomplete and misleading information in the Proxy and the resulting Merger, NTI Unaffiliated Unitholders suffered economic loss because the Merger Consideration did not provide them with fair value for their units.

**B.**   **The Unfair Sale Process**

44.   As described in the Proxy, the Transaction was the result of a fundamentally unfair sales process that was designed to advance WNR's interests at the expense of the NTI Unaffiliated Unitholders.  Indeed, the negotiation process leading up to the signing of the Merger Agreement was marred by numerous conflicts of interest, including the following:

- four of the nine directors of NTI GP were also employees or directors of WNR and owned WNR Common Stock;

- Individual Defendant Lamp, who at the time of the Transaction announcement was the current director, President and CEO of NTI GP, was expected to become the President and Chief Operating Officer of WNR following the consummation of the Merger;

- Certain executive officers of NTI GP owned WNR Common Stock, common units representing limited partner interests of WNRL ("WNRL Common Units"), and/or phantom units in WNRL and are expected to become employees of WNR following the Merger; and

- The directors and executive officers of NTI GP held unvested and outstanding equity awards in NTI that are subject to different treatment under the Merger Agreement than NTI Common Units.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

45.     Further, the Board only vested the NTI GP Conflicts Committee with the authority to review and negotiate the terms of the Transaction.  The NTI GP Conflicts Committee did not conduct an auction process or otherwise attempt to solicit interest from third parties for the acquisition of NTI.  Thus, the NTI GP Conflicts Committee's ability to effectively negotiate on behalf of the NTI Unaffiliated Unitholders was severely hampered by the Board; indeed, WNR knew that the Conflicts Committee could not seek other offers or negotiate with other parties, and thus the Transaction was a *fait accompli*.

46.     The inability of the NTI GP Conflicts Committee to meaningfully negotiate on behalf of the NTI Unaffiliated Unitholders is exemplified by the lack of any real back and forth between the Conflicts Committee and WNR.  Specifically, the Conflicts Committee ultimately agreed to accept an offer that provided virtually the same inadequate consideration to NTI Unaffiliated Unitholders that the Conflicts Committee had previously deemed insufficient.

47.     On October 23, 2015, WNR delivered a proposal to acquire all of the outstanding NTI Common Units not owned by WNR for consideration equal to $17.50 in cash and 0.2266 of a share of WNR Common Stock for each issued and outstanding publicly-held NTI Common Unit (the "October 23 Proposal").  The October 23 Proposal would have provided NTI Unaffiliated Unitholders with total consideration of approximately $25.90 per unit.

48.     The NTI GP Conflicts Committee deemed the October 23 Proposal inadequate, and on December 1, 2015 it instructed Evercore to deliver a counterproposal to WNR via which the Conflicts Committee sought an increase of

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

the exchange ratio for the WNR Common Stock component of the Merger Consideration from 0.2266 of a share of WNR Common Stock to 0.2750 of a share of WNR Common Stock per NTI Common Unit, while maintaining the proposed cash consideration of $17.50 per NTI Common Unit, and suggested that it would seek a term in the Merger Agreement requiring that the Transaction be approved by a majority of the NTI Unaffiliated Unitholders (a "Majority of the Minority Provision").

49.     WNR quickly rejected the NTI GP Conflicts Committee's counterproposal, and, on December 7, 2015, it set forth its best and final offer: $15.00 in cash and 0.2986 of a share of WNR Common Stock (the "December 7 Counterproposal").  In other words, the December 7 Counterproposal proposed the Merger Consideration the NTI GP Conflicts Committee and Board ultimately accepted.

50.     The Merger Consideration as set forth in the December 7 Counterproposal was valued at $26.06 as of the date the Transaction was announced, and thus offered nearly the same amount of consideration that the NTI GP Conflicts Committee had deemed inadequate when it rejected the October 23 Proposal.  As an article from Seeking Alpha states:

> As a current shareholder of Northern Tier, I was disappointed to hear the initial proposal back in October, and just as disappointed to find out today that the final proposal terms have not substantially improved.  **The new proposal simply shifts around the consideration.**[8]

---

[8]     Aurelien Windenberger, *Updated Western Refining Offer Terms Continue To Undervalue Northern Tier's Shares*, SEEKING ALPHA (Dec. 22, 2015, 5:01 PM),

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

51.     In sum, the NTI GP Conflicts Committee failed to meaningfully negotiate with WNR to obtain fair consideration for the NTI Unaffiliated Unitholders, and simply accepted a proposal that provided the same amount of consideration they had previously deemed inadequate.

52.     Further, while the NTI GP Conflicts Committee simply agreed to "shift around" the form of the consideration and accept less cash and more WNR stock, it failed to negotiate an exchange-ratio collar that would have locked in a certain level of value for NTI Unaffiliated Unitholders.  Instead, the Conflicts Committee agreed to a fixed exchange ratio, and therefore the value of the WNR Common Stock that NTI Unaffiliated Unitholders received as part of the Merger Consideration significantly decreased.  Indeed, between the announcement of the Transaction and the close of the Transaction, WNR's common stock price dropped by over 45%, and the Merger Consideration was therefore valued at only $21.05 as of the close of the Transaction.

53.     Additionally, the NTI GP Conflicts Committee failed to secure one of the most meaningful provisions available to protect NTI Unaffiliated Unitholders' interests – the Majority of the Minority Provision.  While the Conflicts Committee initially indicated that it would insist upon such a provision, it ultimately agreed to simply back down and accept a Merger Agreement without one.

54.     As a result, the Transaction was virtually *fait accompli* even at the time the Merger Agreement was first announced.  Because the Merger Agreement was

---

http://seekingalpha.com/article/3772456-updated-western-refining-offer-terms-continue-undervalue-northern-tiers-shares.

able to be approved by holders of a majority of the outstanding NTI Common Units, and WNR already beneficially owned approximately 38.4% of the outstanding NTI Common Units and agreed to vote in favor of the Merger, Defendants only needed to acquire the support of an additional 11.6% of NTI's outstanding Common Units in order to consummate the Transaction. Defendants acquired that additional support by disseminating a materially incomplete and misleading Proxy to NTI Unaffiliated Unitholders. The Proxy was therefore an essential link in the consummation of the Transaction.

55. In sum, the Transaction was the result of fundamentally flawed sale and negotiation process, during which the NTI GP Conflicts Committee failed to meaningfully advocate on behalf of the NTI Unaffiliated Unitholders, agreed to simply accept WNR's lowball offer, and failed to secure terms in the Merger Agreement necessary to adequately protect the interests of NTI Unaffiliated Unitholders. Simply put, the "negotiation" process that Defendants touted to the NTI Unaffiliated Unitholders in the Proxy as supporting the fairness of the Transaction was a sham, and the final outcome of such "negotiations" was set from the start – WNR was going to push through whatever proposal it wanted, and the NTI GP Conflicts Committee wasn't going to resist.

56. After all, while NTI Unaffiliated Unitholders were short-changed, the members of the NTI GP Conflicts Committee will each receive payouts as a result of the Merger that they otherwise would not have. Specifically, all of their outstanding and unvested equity awards will immediately vest, and they will each thus receive $72,690 as a result of the Transaction.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

**C.** **The Unfair Merger Agreement Provisions**

57.    In addition to failing to engage in a fair and reasonable sale process, the NTI GP Conflicts Committee and full Board agreed to certain deal protection provisions that deterred other suitors from submitting a superior offer for NTI.

58.    First, Section 6.6 of the Merger Agreement contained a "no solicitation" provision barring the Partnership from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by WNR.

59.    Pursuant to § 6.6(b) of the Merger Agreement, if an unsolicited bidder had submitted a competing proposal, the Partnership was required to notify WNR of the bidder's identity and the terms of the bidder's offer.   Thereafter, § 6.2(b) required that should the Board determine to enter into a superior competing proposal, it had to grant WNR three days in which the Partnership was required to negotiate in good faith with WNR and allow WNR to amend the terms of the Merger Agreement to make a counter-offer so that any competing proposal no longer constituted a "Superior Proposal."

60.    In other words, the Merger Agreement gave WNR access to any rival bidder's information and allowed WNR a free right to top any superior offer simply by matching it.   Accordingly, no rival bidder emerged, because the Merger Agreement unfairly assured that any "auction" favored WNR, which could piggy-back upon the due diligence of the foreclosed second bidder.

61.    Further, the provisions in the Merger Agreement that purported to give the Board the right to terminate the Merger Agreement in the event a superior proposal emerged were nothing more than an illusory sham.   Because WNR already

owns 38.4% of NTI's outstanding common units and the Conflicts Committee failed to obtain a Majority of the Minority Provision, it was certain that no superior offer would emerge, as any otherwise interested party knew it would be wasting its time because the Transaction was essentially *fait accompli*.

62.     Moreover, pursuant to § 8.2 of the Merger Agreement, NTI was required to pay WNR's expenses in the event the Merger Agreement was terminated by WNR pursuant to certain sections.

63.     Ultimately, these preclusive deal protection provisions restrained NTI's ability to solicit or engage in negotiations with any third party regarding a superior proposal, and NTI Unaffiliated Unitholders were thus certain to be shortchanged via the Transaction.

**D.    The Materially Incomplete and Misleading Proxy**

64.     On May 23, 2016, Defendants caused the Proxy to be filed with the SEC.  On the same date, Defendants caused a Rule 424(b)(3) Prospectus to be filed with the SEC, which incorporates by reference the Proxy.  Defendants intended the statements and information set forth in the Proxy to satisfy their requirements under Rule 13e-3.  Proxy at 57.

65.     The Proxy was disseminated to the Class to solicit their vote in favor of the Merger.  The Proxy omitted material information concerning the Transaction, thereby rendering certain statements misleading.  As a result of the materially incomplete and misleading statements in the Proxy, NTI Unaffiliated Unitholders were unable to make a fully informed decision about whether to vote in favor of the Transaction, and enough NTI Unaffiliated Unitholders were induced to vote for the

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

Merger to consummate it, despite the fact that the Merger Consideration did not provide them with fair consideration for their units.

66.     First, the statements in the Proxy that the Transaction and the Merger Consideration were "fair" to NTI Unaffiliated Unitholders (Proxy at 10-11, 30, 47, 48, 51, 53, 57, 63) were false and misleading, because, in reality, the Merger Consideration drastically undervalued NTI Unaffiliated Unitholders' units. Defendants knew that the Merger Consideration was not actually fair to the NTI Unaffiliated Unitholders, because they were presented with financial analyses by their advisors that indicted NTI's stock was worth as much as $36.48 per share. Defendants further knew that the stock portion of the Merger Consideration was drastically overvalued by Evercore, as WNR's stock price dropped dramatically during the sale process.  Indeed, between December 1, 2015 and December 15, 2015, WNR's stock price dropped from $46.30 to $36.17, approximately 22%. Nevertheless, Defendants proceeded to approve the Merger Agreement on December 21, 2015 and/or deemed the Merger to be "fair" to NTI Unaffiliated Unitholders, even though a significant portion of the Merger Consideration consisted of WNR stock, and there was no exchange-ratio collar in place.

67.     On the trading day prior to the signing of the Merger Agreement, December 18, 2015, WNR stock closed at $37.04.  Rather than using the actual trading value of WNR stock to come up with an indicative valuation of the Merger Consideration, which would have meant that WNR needed to increase the stock portion of the Merger Consideration above 0.2986 of a WNR share in order to provide NTI Unaffiliated Unitholders with fair value, Defendants concocted a way

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

to deceptively jack up the value of the stock component of the Merger Consideration, which grossly overvalued WNR stock at approximately $46.90 to $56.95 per share based on the exchange ratio of 0.2986 (*i.e.* the equivalent of $14.00 to $17.00 in WNR stock based upon the exchange ratio), or *approximately 27% to 54% higher than WNR's actual stock price on December 18, 2015*.  By using Pro Forma Projections prepared by WNR to value the stock portion of the Merger Consideration instead of using WNR's actual stock price, Defendants were able to justify keeping the exchange ratio at 0.2986 of a WNR share per NTI unit, despite the fact that WNR's share price drastically dropped in the weeks leading up to the signing of the Merger Agreement.

68.    The Proxy then misleadingly referred to a "summary valuation of the Merger Consideration range of $29.00 to $32.00" on pages 48, 65, 66, 70, 74, 75, 76, and 88, but the Proxy failed to accurately explain how Evercore determined that range.   Instead, the Proxy at page 86 simply included the following materially incomplete and misleading statement about how Evercore arrived at the $29.00 to $32.00 per share valuation range it continuously touted to NTI Unaffiliated Unitholders in the Proxy:

> Evercore utilized the Discounted Cash Flow analyses, Precedent M&A Transaction analyses and Peer Group Trading analyses valuation ranges per NTI unit developed in the Valuation of Pro Forma WNR to develop an implied value range of the consideration to be received by each NTI Public Unitholder. Based on these analyses in combination, Evercore determined that an appropriate range of value for the consideration to be received by each NTI Public Unitholder was $29.00 to $32.00 per NTI Common Unit.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

69.     The above-referenced "Summary Valuation of the Consideration" is materially incomplete because it fails to explain why Evercore relied upon "the Pro Forma Financial Projections as provided by WNR Management on December 2, 2015" Proxy at 76, in order to calculate an indicative value of the Merger Consideration WNR was offering to the NTI Unaffiliated Unitholders.   In other words, Evercore inexplicably relied upon pro forma financial projections prepared by WNR in order to come up with an indicative valuation for the Merger Consideration WNR was offering to the NTI Unaffiliated Unitholders.   WNR was incentivized to overstate the projections it prepared that were used to value the stock component of the Merger Consideration, as the better the projections, the less stock it would have to offer to NTI Unaffiliated Unitholders in the Transaction. Nevertheless, Evercore inexplicably relied upon financial analyses it performed utilizing the WNR Pro Forma Financial Projections to come up with a *current valuation* for the stock portion of the Merger Consideration, rather than valuing the stock portion of the Merger Consideration at WNR's actual trading price ($37.04 as of December 18, 2015).

70.     NTI Unaffiliated Unitholders would have found it material to know why Evercore decided to rely upon the Pro Form Financial Projections prepared by WNR in valuing the stock portion of the Merger Consideration instead of valuing it based upon WNR's actual trading price.   NTI Unaffiliated Unitholders also would have found it material to know how reliable Evercore and the NTI GP Conflicts Committee deemed the Pro Forma Financial Projections to be, but such information was also omitted from the Proxy.   Indeed, by using the Pro Forma Financial

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

Projections instead of WNR's actual trading price, the "Merger Consideration range of $29.00 to $32.00" Defendants told NTI Unaffiliated Unitholders they were receiving in the Transaction overstated the value of the stock portion of the Merger Consideration, and was therefore misleading. When accounting for the $15.00 cash portion of the Merger Consideration, Defendants told NTI Unaffiliated Unitholders that they were receiving the equivalent of between $14.00 to $17.00 in WNR stock (calculated by subtracting $15.00 from $29.00 and $32.00, respectively). In reality, NTI Unaffiliated Unitholders only received $11.06 worth of WNR stock based upon WNR's December 18, 2015 closing price (calculated by multiplying WNR's closing price of $37.04 by the 0.2986 exchange ratio), and $6.05 worth of WNR stock based upon WNR's closing price on the day the Merger closed, June 23, 2016 (calculated by multiplying WNR's closing price of $20.25 by the 0.2986 exchange ratio).

71. Accordingly, the references to the "Merger Consideration range of $29.00 to $32.00" on pages 48, 65, 66, 70, 74, 75, 76, and 88 of the Proxy are materially misleading, because the actual value of the Merger Consideration was significantly below that range. As noted above, NTI Unaffiliated Unitholders were offered Merger Consideration which consists of both cash and WNR stock. Defendants misleadingly valued the WNR stock portion of the Merger Consideration.

72. Indeed, rather than compare the ranges of values in its discounted cash flow analysis, precedent M&A transaction analysis and peer group trading analysis to the $29.00 to $32.00 summary valuation of the Merger Consideration, a review of the presentation Evercore made to the NTI GP Conflicts Committee demonstrates

DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

that Evercore actually compared those values to the implied merger consideration of $26.06 (which was below the range of 4 of the 6 analyses) and the implied transaction value based on the 20-Day volume weighted average price ("VWAP") of $28.34 (which was below half of the ranges of value).[9]  As a result, the statements in the Proxy that "Evercore compared the[] ranges of value per NTI unit to the valuation of the Merger Consideration of $29.00 to $32.00 per NTI unit" are false and/or misleading.  Indeed, such statements gave off the false and misleading impression that the value of the Merger Consideration was significantly higher than it actually was.

73.    Further, because all Defendants reviewed and/or were aware of Evercore's presentations, Defendants also knew that it was misleading to refer to the "valuation of the Merger Consideration" as "$29.00 to $32.00 per NTI Common Unit" because that range was well above the $28.34 implied value of the Merger Consideration using the October 23, 2015 WNR 20-Day VWAP and even further above the $26.06 implied value of the Merger Consideration based upon WNR's December 18, 2015 closing price.

74.    Because NTI Unaffiliated Unitholders had the option of electing to receive the Mixed Election, the Cash Election of $26.06, or the Stock Election of 0.7036 of a share of WNR common stock, the references in the Proxy to the "Merger Consideration range of $29.00 to $32.00" deceived NTI Unaffiliated

---

[9] Materials Prepared for the Conflicts Committee of the Board of Directors of Northern Tier Energy GP LLC, 68, available at https://www.sec.gov/Archives/edgar/data/1339048/000119312516432514/d255207d ex99c7.htm.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

Unitholders into making the Mixed Election or the Stock Election, because the value of the Cash Election ($26.06) was below the misleading implied $29.00 to $32.00 range of the Merger Consideration referenced in the Proxy.  As noted above, Defendants knew that the $29.00 to $32.00 range overstated the actual value of the WNR stock NTI Unaffiliated Unitholders stood to receive under the Mixed Election and Stock Election.

75.    Even more problematic with respect to the $29.00 to $32.00 range repeatedly referenced in the Proxy is that the implied value of the Merger Consideration had not exceeded $29.00 since October 5, 2015 (over two months before Evercore gave its fairness opinion) and the implied value of the Merger Consideration (based on WNR's actual stock price) had not exceeded $32.00 in the prior 7 years.

76.    Simply put, by repeatedly referencing the "Merger Consideration range of $29.00 to $32.00" in the Proxy, Defendants deceived NTI Unaffiliated Unitholders into thinking the stock portion of the Merger Consideration was more valuable than it actually was.

77.    Moreover, if Evercore really did value the Merger Consideration by utilizing the Pro Forma Financial Projections prepared by WNR management, then bankers could always use bootstrapping to justify a fairness opinion.  By way of example, assuming a partnership is being sold in a unit-for-unit deal (with each seller unitholder receiving one unit in the buyer) and the buyer's stock is trading at $1 per unit and a valuation analysis determines the combined entity is worth $100 per share, that means (under Evercore's apparent logic) that selling a partnership at

$1 per share to a buyer whose units are trading at $1 per share is fair even if the seller partnership was then trading at a $100 per share because a valuation of the combined entity post-close, suggests the combined entity was worth $100 per share. That defies logic and, if in fact is what Evercore did, is a manipulative way to conduct a valuation analysis intended to deceive shareholders.  As a result, the disclosures described above regarding how Evercore arrived at the $29.00 to $32.00 range repeatedly referenced in the Proxy are false or at the very least misleading.

78.     Indeed, by comparing the "implied transaction value range" for each of its analyses to the to the $29.00 to $32.00 range, which was misleadingly described as the "valuation of the Merger Consideration" NTI Unaffiliated Unitholders believed the total value of the Merger Consideration they would receive in connection with the Transaction would actually fall between $29.00 and $32.00.  In reality, NTI Unaffiliated Unitholders receive nowhere close to that much in consideration, as the stock portion of the Merger Consideration was intentionally and drastically overvalued by Evercore, in order to create the false and misleading appearance that the Merger Consideration was fair to NTI Unaffiliated Unitholders.

79.     Additionally, although Evercore provided a "fairness opinion" based on a number of different projection sets, none of those projections were provided by NTI management or were declared to be NTI management's best estimates for the Partnership's future performance.

80.     Accordingly, NTI Unaffiliated Unitholders were left with no understanding of NTI's value based on the views of *its own management*, and instead only got those views from the conflicted buyer and controlling unitholder,

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

WNR.  The Proxy at page 8, however, does make clear that "Senior management of NTI GP provided certain input with respect to NTI's future financial performance that WNR management utilized with respect to the preparation of the Management Projections."  Nevertheless, Defendants failed to disclose or describe the "input" provided by NTI, which renders the Projected Financial Information in the Proxy misleading (Proxy at 58-60), because NTI Unaffiliated Unitholders could not determine to what extent the projections reflected the views of WNR management or NTI management.  A reasonable shareholder would find it material to precisely understand the extent to which projections were prepared by the company attempting to buy his shares, and the extent to which management of the target company participated in preparing the projections.

81.    Similarly, page 40 of the Proxy indicates that "the NTI GP Conflicts Committee . . . set up a due diligence meeting with NTI management to discuss the NTI projections provided by WNR management."  A similar discussion occurred on November 10, 2015.   Defendants were required to disclose to NTI Unaffiliated Unitholders a fair summary of NTI management's views with respect to the projections as discussed at these meetings, so NTI Unaffiliated Unitholders could understand the reliability of the projections prepared by WNR based on the views of the Conflicts Committee and NTI management.  The omission of such information renders the Projected Financial Information in the Proxy misleading (Proxy at 58-60), because NTI Unaffiliated Unitholders could not determine to what extent the projections reflected the views of WNR management or NTI management.

82. Evercore's $2 million fee was contingent upon its ability to render a fairness opinion. Evercore would have been unable to render a fairness opinion had it valued the stock portion of the Merger Consideration based upon WNR's trading price at the time the Merger Agreement was signed. Accordingly, Evercore chose to drastically overvalue the stock portion of the Merger Consideration by utilizing Pro Forma Financial Projections prepared by WNR, and using those projections to drastically overstate the value of the stock portion of the Merger Consideration. Evercore also has a strong relationship with WNR, as it had previously provided financial services to WNR in November 2015 and September 2014, for which it received lucrative fees. Evercore was therefore further motivated to find that the transaction was "fair" to NTI Unaffiliated Unitholders, despite the fact that the Merger Consideration drastically undervalued NTI, in order to maintain its lucrative and friendly relationship with WNR. Indeed, the Proxy notes that Evercore anticipates performing financial advisory services for WNR again in the future. Proxy at 89.

83. The remaining Defendants were aware that Evercore drastically overvalued the WNR stock portion of the Merger Consideration, and that the representations in the Proxy that the "value of the Merger Consideration" ranged from $29.00 to $32.00 were therefore false or misleading. Defendants nevertheless negligently failed to correct the misleading statements in the Proxy.

**E. The NTI Defendants, WNR Defendants, and Individual Defendants Violated Rule 13e-3**

84. WNR and MergerCo are affiliates of NTI for purposes of Rule 13e-3.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

85.    As WNR's own SEC filings confirm, the Transaction was a "going private" transaction, and, therefore, the NTI Defendants, WNR Defendants, and Individual Defendants were required to express their beliefs as to the fairness of the Transaction to NTI Unaffiliated Unitholders pursuant to Rule 13e-3.    The NTI Defendants, WNR Defendants, and Individual Defendants have failed to fulfill their obligations, in violation of Rule 13e-3.

86.    Specifically, Item 8(b) of Schedule 13e-3 concerns the factors underlying a belief as to the fairness of the transaction.  The SEC has issued the following guidance to prospective issuers:

> The Division is concerned that in many instances the Item 8(b) disclosure being made to security holders is vague and non-specific and is therefore of limited utility to security holders. . . . Each such factor which is material to the transaction should be discussed and, in particular, *if any of the sources of value indicate a value higher than the value of the consideration offered to unaffiliated security holders, the discussion should specifically address such difference and should include a statement of the bases for the belief as to fairness in light of the difference.*

Exchange Act Release No. 34-17719, at 17, 245-42.

87.    NTI Defendants, WNR Defendants, and the Individual Defendants failed to comply with their obligations under this Rule.  Specifically, while they purported to set forth their position as to the fairness of the Merger on page 57 of the Proxy, they simply provided certain boiler-plate language setting forth the fact that they did not undertake "any independent evaluation of the fairness of the Merger to the NTI Unaffiliated Unitholders…" but that they nevertheless believed that the Merger was "substantively and procedurally fair to the NTI Unaffiliated

Unitholders" based upon "procedural safeguards implemented during the negotiation of the Merger Agreement" and based upon the NTI GP Conflicts Committee's determination that the Transaction was fair as set forth in the section of the Proxy entitled "Recommendation of the NTI GP Conflicts Committee and Its Reasons for Recommending Approval of the Merger Proposal and the NTI Compensation Proposal." Proxy at 57.

88.    The Proxy contains a section summarizing the financial analyses of Goldman Sachs, which constitute "sources of value that indicate a value higher than the value of the consideration offered to unaffiliated security holders." Proxy at 89-96. Specifically, in connection with its Illustrative Discounted Cash Flow Analysis, Goldman Sachs determined that NTI Common Units were worth up to $32.84 per unit (Proxy at 93); in connection with its Illustrative Present Value of Future Unit Price Analysis, Goldman Sachs determined that NTI Common Units were worth up to $33.02 in fiscal year 2016, and up to $44.19 in fiscal year 2019 (Proxy at 93). However, NTI Defendants, WNR Defendants, and the Individual Defendants failed to include a discussion that specifically addressed the difference in the valuation analyses and implied NTI share price arrived at by Goldman Sachs, and a statement of the bases for their belief as to the fairness of the Merger Consideration in light of the difference between the implied price per share of NTI units arrived at by Goldman Sachs.

89.    The Proxy also contains a section summarizing the financial analyses of Evercore, which constitute "sources of value that indicate a value higher than the value of the consideration offered to unaffiliated security holders." Proxy at 62-86.

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

Specifically, in connection with its "Analysis of NTI", Evercore determined that NTI units were worth up to $31.29 via a Discounted Cash Flow Analysis (Proxy at 66), $32.27 via a MLP Merger and MLP Buy-Ins Premiums Paid Analysis (Proxy at 75), and $36.48 via a Refining Transactions Premiums Paid Analysis (Proxy at 76). However, NTI Defendants, WNR Defendants, and the Individual Defendants failed to include a discussion that specifically addressed the difference in the valuation analyses and implied NTI share price arrived at by Evercore, and a statement of the bases for their belief as to the fairness of the Merger Consideration in light of the difference between the implied equity value per NTI Common Unit arrived at by Evercore.

90.    Instead, NTI Defendants, WNR Defendants, and the Individual Defendants relied upon the type of statement that the instructions to Regulation M-A 229.1014, have explicitly stated is insufficient.  That regulation states: "Conclusory statements, such as 'The Rule 13e-3 transaction is fair to unaffiliated security holders in relation to net book value, going concern value and future prospects of the issuer' will not be considered sufficient disclosure in response to paragraph (b) of this section."

91.    NTI Defendants, WNR Defendants, and the Individual Defendants have therefore violated Rule 13e-3 of the Exchange Act.

## CLASS ACTION ALLEGATIONS

92.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

93.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of May 19, 2016, there were over 93 million outstanding NTI common units.  The holders of these units are believed to be geographically dispersed through the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

      i.     Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

     ii.     Whether the WNR Defendants, NTI Defendants, and Individual Defendants have violated Rule 13e-3;

    iii.     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iv.     Whether Plaintiff and the other members of the Class have suffered damages as a result of Defendants' violations of the Exchange Act.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

94.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

95.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

96.    As detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omitted material information concerning the valuation of the Merger Consideration and the projections summarized in the Proxy, and misleadingly told NTI Unaffiliated Unitholders that the "valuation of the Merger Consideration" was "$29.00 to $32.00 per NTI unit" and that the Merger was "fair" to them, when, in reality, the value of the Merger Consideration was significantly below that range and was not fair to NTI Unaffiliated Unitholders.

97.    Defendants issued the Proxy or allowed their names to be used in the Proxy with the intention of soliciting the support of NTI Unaffiliated Unitholders for the Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which misleadingly described the value of the Merger Consideration received by NTI Unaffiliated Unitholders, and which omitted the above-referenced material information regarding the projections summarized in the Proxy and the bases for Defendants conclusion that the Merger was fair to NTI Unaffiliated Unitholders.  In so doing, Defendants made materially incomplete and misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.

98.    Each of the Individual Defendants, by virtue of their roles as officers and/or directors of NTI, were obligated to review Evercore's presentations and the Proxy and were therefore aware of the above-referenced misleading statements and omitted information, but failed to disclose or correct such information, in violation of Section 14(a). The Individual Defendants and NTI Defendants further knew that the statements in the Proxy that the "value of the Merger Consideration" ranged

from "$29.00 to $32.00 per NTI Common Unit" and that the Merger was "fair" to NTI Unaffiliated Unitholders were false and/or misleading, because they were presented with or reviewed valuation analyses by Evercore and Goldman Sachs that indicated the Merger Consideration failed to provide NTI Unaffiliated Unitholders with fair value for their shares, and knew that the $29.00 to $32.00 range referenced in the Proxy drastically overvalued the stock portion of the Merger Consideration, as the price of WNR's common stock dropped drastically in the weeks preceding the signing of the Merger Agreement and Evercore's presentations indicated that the value of the Merger Consideration was only $26.06 based upon WNR's December 18, 2015 closing price. The Individual Defendants and NTI Defendants further knew that the Proxy failed to disclose material information regarding NTI and NTI management's views with respect to the financial projections set forth in the Proxy, as such views were discussed during meetings held on November 5, 2015 and November 10, 2015, but were not fairly and adequately summarized in the Proxy. The Individual Defendants and NTI Defendants were therefore negligent in allowing and failing to correct to the above-referenced material misstatements and omissions in the Proxy.

99. Further, Evercore, as the NTI GP Conflicts Committee's financial advisor, was involved in preparing, editing, reviewing, and approving the Proxy, including but not limited to the section entitled "Opinion of Evercore Group L.L.C." that spans pages 62 to 88 of the Proxy. Due to its efforts in preparing, editing, reviewing, and approving the Proxy, Evercore knew that the Proxy misleadingly described the value of the Merger Consideration by drastically overvaluing the stock

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

portion of the Merger Consideration and stating that the "value of the Merger Consideration" ranged from "$29.00 to $32.00 per NTI Common Unit."   Evercore further knew that the Proxy failed to disclose material information regarding NTI's and NTI management's views with respect to the financial projections set forth in the Proxy, as Evercore was present at various Board and/or Conflict Committee meetings during which such views were discussed.   Evercore was therefore negligent in allowing and failing to correct to the above-referenced material misstatements and omissions in the Proxy.

100.   The WNR Defendants were also involved in preparing, editing, reviewing, and approving the Proxy, as the WNR Defendants attempted to fulfill their obligations under Rule 13e-3 via the statements in the Proxy, Proxy at 57, and various portions of the Proxy purport to summarize meetings, events, or financial information involving the WNR Defendants.   The Merger Agreement also gave the WNR Defendants the right to review and edit the Proxy.   The WNR Defendants therefore knew, or were negligent in not knowing, that the Proxy contained the above-referenced misleading statements and omitted the above-referenced material information, and were also negligent in failing to ensure that the Proxy was materially complete and not misleading.   Indeed, the WNR Defendants knew that WNR's stock price had dropped drastically in the weeks preceding the signing of the Merger Agreement and that the value of the Merger Consideration was only $26.06 based upon WNR's December 18, 2015 closing price, and therefore knew that the references in the Proxy to the Merger Consideration being worth $29.00 to $32.00

were misleading because the range drastically overvalued the stock portion of the Merger Consideration.

101.   Each of the Defendants prepared, reviewed and/or disseminated the false and misleading Proxy, and allowed their names to be used in connection with the proxy solicitation.  The Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not false and/or misleading.  Defendants were obligated to review the Proxy to ensure that it was materially complete and did not contain false or misleading statements before it was disseminated to NTI Unaffiliated Unitholders.

102.   Defendants negligently disregarded that the Proxy was materially misleading and omits material information necessary to render it not misleading. The Proxy states that Evercore both reviewed and discussed its financial analyses with the Board and the Conflicts Committee during various meetings, and further states that the Board and the Conflicts Committee considered the financial analyses provided by Evercore as well as Evercore's fairness opinion and the assumptions made and matters considered in connection therewith.  The Individual Defendants negligently disregarded that the material information identified above was misstated and/or omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

103.   As a direct result of Defendants' preparation, review and dissemination of the false and/or misleading Proxy, The Class was precluded both from exercising their right to seek appraisal and were induced to vote their units and accept the inadequate Merger Consideration.  The false and/or misleading Proxy used to obtain

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

unitholder approval of the Merger deprived Plaintiff and the Class of their right to a fully informed unitholder vote in connection therewith and of the full and fair value for their NTI units, and caused enough NTI Unaffiliated Unitholders to vote in favor of the Transaction, which resulted in all NTI Unaffiliated Unitholders giving up their NTI units in exchange for the inadequate Merger Consideration.  The Proxy was thus an essential link in causing the Company's unitholders to approve the Merger.

104.   As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain unitholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (i.e. the difference between the value of the Merger Consideration NTI Unaffiliated Unitholders received and the true value of their units at the time of the Merger) in an amount to be determined at trial.  Plaintiff and the Class have therefore suffered economic loss and are entitled to monetary damages.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## **COUNT II**

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

105.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

106.   The Individual Defendants acted as controlling persons of NTI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of NTI's General Partner, and

participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

107.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board and the Conflicts Committee prior to voting on the Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Transaction.  They were, thus, directly involved in the making of the Proxy.

109.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and

information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

110.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

111.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have been harmed.

112.   Plaintiff and the Class have therefore suffered economic loss and are entitled to monetary damages.

## COUNT III

**On Behalf of Plaintiff and the Class Against the NTI Defendants, WNR Defendants, and Individual Defendants for Violations of Section 13(e) and Rule 13e-3**

113.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114.   Because the Transaction concerns a "going private" transaction, NTI Defendants, WNR Defendants, and the Individual Defendants were required to express their beliefs as to the fairness of the Transaction to NTI Unaffiliated Unitholders pursuant to Rule 13e-3.   NTI Defendants, WNR Defendants, and the Individual Defendants failed to fulfill their obligations, in violation of Rule 13e-3.

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

DeCONCINI McDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300

115.   Specifically, Item 8(b) of Schedule 13e-3 concerns the factors underlying a belief as to the fairness of the transaction.   The SEC has issued the following guidance to prospective issuers:

> The Division is concerned that in many instances the Item 8(b) disclosure being made to security holders is vague and non-specific and is therefore of limited utility to security holders. . . . Each such factor which is material to the transaction should be discussed and, in particular, *if any of the sources of value indicate a value higher than the value of the consideration offered to unaffiliated security holders, the discussion should specifically address such difference and should include a statement of the bases for the belief as to fairness in light of the difference.*

Exchange Act Release No. 34-17719, at 17, 245-42.

116.   NTI Defendants, WNR Defendants, and the Individual Defendants failed to comply with their obligations under this Rule.   Specifically, while NTI Defendants, WNR Defendants, and the Individual Defendants purported to set forth their position as to the fairness of the merger on page 57 of the Proxy, they simply provided certain boiler-plate language setting forth the fact that they did not undertake "any independent evaluation of the fairness of the Merger to the NTI Unaffiliated Unitholders…" but that they nevertheless believed that the Merger was "substantively and procedurally fair to the NTI Unaffiliated Unitholders" based upon "procedural safeguards implemented during the negotiation of the Merger Agreement" and based upon the NTI GP Conflicts Committee's determination that the Transaction was fair as set forth in the section of the Proxy entitled "Recommendation of the NTI GP Conflicts Committee and Its Reasons for

Recommending Approval of the Merger Proposal and the NTI Compensation Proposal."

117.   The Proxy contains a section summarizing the financial analyses of Goldman Sachs, which constitute "sources of value that indicate a value higher than the value of the consideration offered to unaffiliated security holders."  However, NTI Defendants, WNR Defendants, and the Individual Defendants failed to include a discussion that specifically addresses the difference in the valuation analyses and implied NTI share price arrived at by Goldman Sachs, and a statement of the bases for their belief as to the fairness of the Merger Consideration in light of the difference between the implied price per share of NTI units arrived at by Goldman Sachs.

118.   The Proxy also contains a section summarizing the financial analyses of Evercore, which constitute "sources of value that indicate a value higher than the value of the consideration offered to unaffiliated security holders."  However, NTI Defendants, WNR Defendants, and the Individual Defendants failed to include a discussion that specifically addresses the difference in the valuation analyses and implied NTI share price arrived at by Evercore, and a statement of the bases for their belief as to the fairness of the Merger Consideration in light of the difference between the implied price per share of NTI units arrived at by Evercore.

119.   NTI Defendants, WNR Defendants, and the Individual Defendants have therefore violated Rule 13e-3 of the Exchange Act.

120.   As a direct result of the NTI Defendants', WNR Defendants', and Individual Defendants' preparation, review and dissemination of the false and/or

misleading proxy statement and violation of Rule 13e-3, The Class was precluded both from exercising their right to seek appraisal and were induced to vote their units and accept the inadequate Merger Consideration.  The false and/or misleading Proxy used to obtain unitholder approval of the Merger deprived Plaintiff and the Class of their right to a fully informed unitholder vote in connection therewith and to the full and fair value for their NTI units, and caused enough NTI Unaffiliated Unitholders to vote in favor of the Transaction, which resulted in all NTI Unaffiliated Unitholders giving up their NTI units in exchange for the inadequate Merger Consideration.   The Proxy was thus an essential link in causing the Company's unitholders to approve the Merger.

121.   As a direct and proximate result of the NTI Defendants', WNR Defendants', and Individual Defendants' preparation, review and dissemination of the false and/or misleading proxy statement and violation of Rule 13e-3, Plaintiff and the Class have suffered damages and actual economic losses (i.e. the difference between the price NTI Unaffiliated Unitholders received and the true value of their units at the time of the Merger) in an amount to be determined at trial.  Plaintiff and the Class have therefore suffered economic loss and are entitled to monetary damages.  By reason of the misconduct detailed herein, NTI Defendants, WNR Defendants, and the Individual Defendants are liable pursuant to § 13(e) of the Exchange Act and SEC Rule 13e-3 promulgated thereunder.

/ / /

/ / /

/ / /

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands monetary damages and other relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring this action to be a proper Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Declaring that the Proxy distributed by Defendants to the NTI Unaffiliated Unitholders was materially false and misleading, in violation of Sections 13(e) and 14(a) of the Exchange Act and Rules 13e-3 14a-9 promulgated thereunder;

C.      Awarding Plaintiff and the members of the Class compensatory and/or recissory damages against the Defendants, including, but not limited to, pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs and disbursements;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

/ / /

/ / /

/ / /

/ / /

/ / /

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd, Suite 200
Tucson, AZ 85716-5300

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 24, 2016          By:  /s/__Gary F. Urman_____
                                 Gary F. Urman
                                 DeConcini McDonald Yetwin & Lacy, P.C.
                                 2525 E. Broadway, Suite 200
                                 Tucson, AZ 85716
                                 Tel.: (520) 322-5000
                                 Fax: (520) 322-5585
                                 Email: gurman@dmyl.com

                                 *Counsel for Plaintiff Jeff Kendig*

**OF COUNSEL**

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: nfaruqi@faruqilaw.com

Derrick B. Farrell
**FARUQI & FARUQI, LLP**
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: dfarrell@faruqilaw.com

Juan E. Monteverde
**MONTEVERDE & ASSOCIATES
 PC**
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 601-2610
Email:
jomteverde@monteverdelaw.com

*Counsel for Plaintiff Jeff Kendig*

DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd. Suite 200
Tucson, AZ 85716-5300